## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SANDRA WASHINGTON DAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19 C 5551 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| ROBIN CARNAHAN, Administrator, | ) | |
| General Services Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Sandra Washington Day, a Black female, worked for the General Services Administration ("GSA"), a branch of the federal government responsible for managing governmental workplaces, from 2001 until 2018. During the entire time, Day served as a program analyst in GSA's financial management group and was compensated at the "GS-9" pay level (ninth out of fifteen grades on GSA's General Schedule pay scale). According to Day, however, from 2016 to 2017, she performed many of the same duties as her two of her white male colleagues, who enjoyed the higher "GS-12" pay grade. Based on this disparity, Day brings claims of race and sex discrimination under Title VII and the Equal Pay Act against GSA's Administrator (whom the Court will also refer to as "GSA" for short).

Now before the Court is GSA's motion for summary judgment. For the reasons given below, the motion is granted.

---

[1] General Service Administration's current Administrator Robin Carnahan is automatically substituted for her predecessor as party defendant pursuant to Federal Rule of Civil Procedure 25(d). *See* Fed. R. Civ. P. 25(d).

# I.    Background[2]

Day began working for GSA's Chicago office as a GS-9 program analyst in the financial management group in 2001.  Def.'s LR 56.1(a)(3) Statement of Facts ("DSOF") ¶ 1, ECF No. 42.  Specifically, Day worked in the accounts payable group, which handled certain duties related to the issuance of payments for goods and services received by GSA; for example, as part of her work, Day matched invoices with reports to confirm that GSA had received the goods or services in question.  *Id.* ¶ 4.  Until invoices are so matched, the accounting system tags them with a "P040" designation, and they cannot be paid.  This may result in the accrual of unnecessary interest charges to the government.  *Id.* ¶ 6.

In early 2016, the financial management group underwent a reorganization. *Id.* ¶ 8.  The nation was apportioned into geographic zones, and Day's sub-group was assigned to handle Zone 1.  *Id.*  Day also began reporting to supervisory financial management analyst Lynn Wu.  *Id.* ¶ 2.

Shortly afterward, Stanley Swiszcz joined Day in Zone 1.  Swiszcz, a GS-12 financial management analyst, was brought in to replace James Swanson, another white male, who had served as the GS-12 financial management analyst in the sub-group before retiring.  *Id.* ¶¶ 11, 12.  Swiszcz too reported to Wu.  *Id.* ¶ 11.

Much of the parties' dispute concerns the extent to which Day performed, and Wu allowed or assigned her to perform, duties more typical of someone in a GS-12 position, after the reorganization.  GSA, for instance, insists that Wu only assigned

---

[2]    The following facts are undisputed or deemed admitted, unless otherwise noted.

GS-9 work to Day, including routine P040 exceptions and data entry work, and that Day rarely handled more complex exception codes. *Id.* ¶¶ 10, 15. By contrast, Day asserts that Swiszcz taught her how to deal with more complex exception codes and that she did so regularly, as well as handling other complicated duties. Furthermore, Day claims that Wu was well aware of this. Pl.'s LR 56.1(b)(3) Statement of Facts ("PSOF") ¶¶ 23–34, ECF No. 45.

The parties also dispute the specifics of Swiszcz's job duties, although they generally agree that he handled some P0404 exceptions and some more complex exceptions "that required analysis." *See* DSOF ¶¶ 13–14; PSOF ¶¶ 13–14, ECF No. 45. At the same time, there is no dispute that Day began to receive a wider array of responsibilities after telling Wu during her biannual evaluation in May 2016 that she wanted to work toward a promotion. DSOF ¶¶ 16–18.

In March 2017, Day's accounts payable group held a meeting in New York City, at which she met Swiszcz in person for the first time. *Id.* ¶ 21. Day states that she "realized" at this meeting that her and Swiszcz's duties "were pretty much the same," but that Swiszcz was getting paid at the higher GS-12 rate. *Id.*, Ex. 3, Day Dep. at 36:7–20, ECF No. 42-1.

Suspecting race and sex discrimination, Day approached Wu later that month with her concern that she was not being treated fairly because, in her view, she was performing the same duties as Swiszcz, while getting paid a lower GS-9 salary. DSOF ¶ 19; *see also id.*, Ex. 5, Wu Dep. at 105:7–16, ECF No. 42-2; Day Dep. at 17:18–18:10, 38:14–18. Day told him that she felt like her duties "warranted" a promotion to GS-

11 or GS-12.[3]  Wu Dep. at 105:24–106:1.  Wu, however, responded that GSA was on a hiring freeze under the new presidential administration "and that there would be no availability to post any vacancies" for the time being.  Wu Dep. at 105:24–106:4; *see also id.* at 135:8–11.  Instead, Wu suggested that Day request a "desk audit," a process by which Human Resources ("HR") examines an employee's position to determine whether it is appropriately classified on GSA's pay scale.  DSOF ¶ 23.

In May 2017, Day emailed Wu to request additional training to help her pursue a promotion to GS-11 or GS-12.  DSOF ¶ 24; Day Dep. at 38:7–13; Wu Dep. at 106:10–19.  Wu forwarded the request to HR, which took over from there.  DSOF ¶ 24.

Day also scheduled a desk audit for the month of June, but ultimately cancelled it after losing "confidence in the system" upon learning that seventy percent of desk audits "are found in favor of management."  Day Dep. at 40:17–41:1; DSOF ¶¶ 25–26.  Day then went on medical leave in July 2017.  DSOF ¶ 30.  She returned to work briefly in 2018, before being removed for reasons not relevant to this case.  *Id.*

After exhausting her administrative remedies, Day filed this action on August 16, 2019, raising three claims: (1) race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1); (2) sex discrimination in violation of the same; and (3) sex discrimination in violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1).  *See* Compl. ¶¶ 30–53, ECF No. 1.  GSA now moves for summary judgment on Counts I and II, as well as dismissal of Count III for lack of subject-matter jurisdiction.  *See* Def.'s Mot. Summ. J., ECF No. 40.

---

[3]    To go from GS-9 to GS-12, an employee must first be promoted to GS-11.  DSOF, Ex. 16, Wu EEO Investigation Aff. at 4, ECF No. 42-3 at 115–23.

4

## II.     Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014). In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then "come forth with specific facts showing that there is a genuine issue for trial." *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019). To satisfy that ultimate burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor," *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

### III.  Analysis

GSA moves for summary judgment on Day's discrimination claims under Title VII.  To survive a motion for summary judgment, a Title VII claimant must produce enough evidence for a reasonable factfinder to conclude "that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  Because Day's race and sex discrimination claims each turn on this standard, the Court analyzes them together.

In the absence of direct evidence of discrimination, a Title VII claimant may proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Farrell v. Butler Univ.*, 421 F.3d 609, 612–13 (7th Cir. 2005).  Under this approach, the claimant first must establish a prima facie case of discrimination.  *Id.* at 613.  To do so, the plaintiff "must show that she: (1) is a member of a protected class, (2) is performing her job satisfactorily, (3) suffered an adverse employment action, and (4) was treated less favorably than at least one similarly-situated . . . colleague" outside of her protected class.  *Id.*

Once the plaintiff has established a prima facie case, the burden "shifts to the defendant to provide a legitimate, nondiscriminatory reason" for the challenged employment action.  *Id.*  If the defendant satisfies this burden, "the burden shifts back to the plaintiff to show that the defendant's explanation was pretextual."  *Id.*  Pretextual means that the defendant's "proffered reason is a lie or completely lacks a factual basis."  *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000).

6

In her complaint, Day characterized GSA's adverse employment action as a failure to promote her to the rank of GS-12. *See* Compl. ¶¶ 33–35, 41–42. "In order to make a prima facie showing of discrimination in a failure to promote case, the plaintiff must demonstrate that (1) he was a member of a protected group; (2) he applied for and was qualified for the position sought; (3) he was rejected for the position; and (4) those who were promoted had similar or lesser qualifications for the job." *Ghosh v. Ind. Dep't of Env't Mgmt.*, 192 F.3d 1087, 1090–91 (7th Cir. 1999).

GSA contends that Day cannot make this showing because she never sought, and thus was never denied, a promotion to GS-12. *Cf. Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 434 (7th Cir. 2005) (affirming grant of summary judgment on failure-to-promote claim where plaintiff "did not apply for" the job openings at issue, "and therefore could not have been rejected for promotion to either opening"). The Court agrees. It is undisputed that Day never applied for a promotion. DSOF ¶ 3. It is also undisputed that, due to a hiring freeze, Wu had no authority to grant a promotion when Day approached her about one in 2017. *Id.* ¶ 23. For the same reason, there were no vacant posts to which Day could have sought a promotion at that time. *Id.*

Furthermore, Day voluntarily declined to proceed with a desk audit, by which her pay could have been upgraded without a promotion. *Id.* ¶ 25. Thus, while the denial of a promotion certainly constitutes an adverse employment action under Title VII, Day did not suffer any such denial. *See, e.g.*, *Poullard v. McDonald*, 829 F.3d 844, 858–59 (7th Cir. 2016) (affirming summary judgment for defendant where plaintiff never sought a promotion and was properly denied a desk audit); *Dickey v.*

7

*McDonald*, 238 F. Supp. 3d 1068, 1075 (N.D. Ill. 2017) (granting summary judgment for defendant where plaintiff's supervisor had no authority to grant a promotion and plaintiff refused to request a desk audit).

Tacitly conceding this, Day suggests that she experienced an adverse employment action simply because she was performing GS-12 work at a GS-9 salary, while Swiszcz (and his predecessor, Swanson) were performing the same work at GS-12 salaries. The Seventh Circuit has recognized, in the context of a discrimination claim under the Fair Pay Act, that a plaintiff may charge such a "disparate-pay" theory in addition to a "pure failure-to-promote" theory. *See Poullard*, 829 F.3d at 853. But it is unclear whether a disparate-pay theory can satisfy the element of an adverse employment action for purposes of a Title VII discrimination claim. *Cf. id.* (noting that the Fair Pay Act contemplates "a very specific type of claim" relating to differential pay or benefits between similarly situated employees). Day completely overlooks this issue, failing to cite any authority in support.

But, even assuming that the pay disparity between Day and her GS-12 colleagues, in and of itself, constitutes an adverse employment action under Title VII, this disparate-pay theory fails for reasons similar to those in *Poullard*. There, much like Day, the plaintiff was a GS-11 government employee who claimed to have been assigned GS-13 duties. *Id.* at 854. In rejecting the plaintiff's disparate-pay claim, the court held that his GS-13 supervisor was not an appropriate comparator under the fourth element of his prima facie case, which turns on such factors as "whether the employees in question had the same job description, were subject to the same

8

standards, had the same supervisor, and had comparable experience, education, and other qualifications." *Id.* at 855. That the plaintiff performed "a number" of duties "that ought to have been done" by his supervisor was "not enough to make [them] sufficiently comparable 'in all material respects,'" given the differences between their titles, job descriptions, experience, and supervisors. *Id.* (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)).

Similarly, here, a reasonable jury could not find that Swiszcz or Swanson is comparable to Day "in all material respects." *See Patterson*, 281 F.3d at 680. For starters, Day held the position of program analyst, whose essential duties entail performing "limited" analyses and conducting "routine studies," while Swiszcz and Swanson held the position of financial management analyst, whose essential duties entail performing "a wide range" of analyses and conducting "complex analytical studies." *Compare* DSOF, Ex. 11, Financial Management Analyst Salesforce Post at 1–2, ECF No. 42-3, *to id.*, Ex. 13, Program Analyst Salesforce Post at 2, ECF No. 42-3. These differences carried over into the real world as well. For example, whereas financial management analysists do not perform data entry, Day continued to make hundreds of data entries in 2016 and 2017. *See id.*, Ex. 10, Saucedo ¶¶ 5–6, ECF No. 42-3. While Day contends that she also performed many of the same duties as Swiszcz during those years, she did not perform them all. For instance, only Swiszcz was responsible for preparing monthly interest reports. DSOF ¶ 14. And Day points to no evidence contradicting GSA's position that she seldomly handled exception codes more complex than P040, whereas Swiszcz did so regularly. *Compare id.*, Ex. 6,

Swiszcz Dep. at 41:23–43:19, ECF No. 42-3 (stating that Day handled exception codes other than P040 "very few" times), *to* PSOF, Ex. 2, Day Decl. ¶¶ 26–32, ECF No. 45-2 (noting five instances in which Day handled exception codes other than P040). To cap it off, Day was not even eligible for a GS-12 position because she lacked the prerequisite year of GS-11 experience, DSOF ¶ 23, whereas Swiszcz had over six years of GS-12 experience under his belt when he joined Day's team, *id.*, Ex. 9, Reinfelds Decl. ¶¶ 2–3, ECF No. 42-3.[4]

Even assuming for the sake of further argument that Day could meet all the elements of her prima facie case under a disparate-pay theory, GSA has shown legitimate, nondiscriminatory reasons for the pay disparity between Day and her GS-12 colleagues. Simply put, Day received a GS-9 salary because she was hired into a GS-9 position and never applied for a promotion, while Swiszcz and Swanson received GS-12 salaries because they applied for (and received) GS-12 positions. The disparity at issue was the product of these very differences relating to GSA's pay scale. Day presents no evidence that this standard application of the pay scale was pretextual, and it is hard to see how she could. Instead, Day's evidence of pretext goes only to whether she *would have* been competent to perform a GS-12 position, had there been any GS-12 vacancies to which she *could have* sought promotion.

Finally, setting aside the *McDonnell Douglas* framework and examining the record as a whole, the Court discerns no evidence "that would permit a reasonable

---

[4]    In theory, Day might have presented evidence comparing herself to other GS-9 employees who, unlike herself, "were not assigned [more advanced] tasks," much like the plaintiff in *Poullard* had done in the district court. *See* 829 F.3d at 854–55. Because Day has not done so, however, she has not identified an appropriate comparator at the GS-9 level.

factfinder to conclude" that Day's race or sex "caused" the pay disparity of which she complains. *See Ortiz*, 834 F.3d at 765. This is true for all the same reasons explained above. In short, the pay disparity existed because Day was hired into a GS-9 position, never applied for a promotion to GS-12, and declined to go through with a desk audit, while Swiszcz and Swanson applied for and received GS-12 positions. Accordingly, GSA is entitled to summary judgment on Day's Title VII claims.

As for Day's claim under the Equal Pay Act, GSA contends that subject-matter jurisdiction lies exclusively with the United States Court of Federal Claims because Day seeks more than $10,000 in damages. *See Clark v. United States*, 691 F.2d 837, 840 (7th Cir. 1982) ("Without a statutory waiver, the district courts have no jurisdiction over a claim for damages against the United States, and the Tucker Act bars their jurisdiction over claims like these in excess of $10,000." (internal citation omitted)). In her response, Day concedes that the Court lacks jurisdiction over this claim given the amount at stake. For that reason, Count III is dismissed without prejudice. *See Murray v. Conseco, Inc.*, 467 F.3d 602, 605 (7th Cir. 2006).

IV. **Conclusion**

For the reasons given above, GSA's motion for summary judgment is granted. Judgment will be entered accordingly in favor of GSA on Counts I and II, while Count III is dismissed without prejudice for lack of subject-matter jurisdiction. Civil case terminated.


**IT IS SO ORDERED.**          **ENTERED: 9/15/21**

**John Z. Lee**
**United States District Judge**